IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| SENSORRX, INC. | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | **Jury Trial Demanded** |
| | ) | |
| ELI LILLY AND COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff SensorRx, Inc. ("SensorRx") brings this action against Eli Lilly and Company ("Eli Lilly") to recover monetary damages and obtain injunctive relief as a result of Eli Lilly's conduct alleged below.

## I.   INTRODUCTION

1.      In 2015, SensorRx began development of what ultimately became a physician-recommended migraine management system. The system uses a software program called MigrnX that assists migraine sufferers with the tracking and treatment of migraines using their cell phones. The MigrnX platform -- which ensures accurate and timely reporting and features automatic transmission of the data to the patients' electronic medical record -- has proven to be one of the most effective migraine programs available.

2.      In the fall of 2018, after MigrnX's effectiveness was established and recognized in the marketplace, Eli Lilly expressed interest in entering into a potential partnership and investment in SensorRx. Unbeknownst to SensorRx, Eli Lilly during the same time frame had also made a decision to begin development of

a mobile phone application called Vega Migraine that would compete with MigrnX. Eli Lilly only disclosed to SensorRx the fact that it was actually developing a competing application after SensorRx had committed to engaging in negotiations to enter into a business relationship with Eli Lilly related to MigrnX.

3.     Eli Lilly induced SensorRx to continue engaging in the negotiations by committing in a mutual confidentiality agreement that Eli Lilly would use SensorRx's confidential information only for the purpose of deciding whether to enter into a business relationship and by repeatedly guaranteeing that the team developing the competing Vega Migraine application would not have access to any SensorRx confidential information disclosed during the negotiations, including access to the MigrnX software application.

4.     However, immediately after Eli Lilly first made these commitments, members of the Vega Migraine development team (including a consultant to Eli Lilly employed by PricewaterhouseCoopers ("PwC")) used information obtained by the Eli Lilly due diligence team to fraudulently pose as migraine patients in order to obtain full access to the MigrnX application.

5.     Over a three-month period, the Vega Migraine team repeatedly and fraudulently accessed the MigrnX application and a related product owned by SensorRx called Migraine Coach. During that time, the Vega Migraine application evolved from a complicated and ineffective program to an application that was in many respects almost identical to MigrnX. At that point, even though Eli Lilly had told SensorRx that it was going to proceed with its investment in and partnership

2

with SensorRx, Eli Lilly abruptly terminated the negotiations and notified SensorRx that it preferred to focus its efforts on marketing its own application.

6. Even after terminating negotiations, Eli Lilly's employees continued to unlawfully access MigrnX as the Eli Lilly team worked to finalize and release Vega Migraine.

7. When Eli Lilly released its own competing application on or about November 5, 2019, it was nearly identical to the MigrnX migraine management system in user interface, user experience, and functionality. Moreover, in order to more swiftly and effectively launch Vega Migraine, Eli Lilly has proceeded to exploit the knowledge about marketing this type of application that it gained from SensorRx under the guise of partnering with SensorRx.

8. Eli Lilly has through fraud and unfair and deceptive practices stolen SensorRx's confidential information, including trade secrets, in order to expedite transformation of Vega Migraine from an ineffective application likely to fail into one that can, through strategies misappropriated from SensorRx, be effectively marketed. Further, now that Eli Lilly has stolen SensorRx's MigrnX platform, it can now pursue the business plan SensorRx had confidentially outlined for Eli Lilly: a plan to use the MigrnX platform to develop similar health management systems for other health conditions. In the process, because of Eli Lilly's market power and reach, Eli Lilly will, if not stopped, essentially destroy SensorRx's current and future business. It will, in short, destroy SensorRx.

3

## II.   PARTIES

9.     SensorRx is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Charlotte, North Carolina.

10.    Eli Lilly is a corporation organized and existing under the laws of the state of Indiana, having its corporate offices and principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

11.    Eli Lilly routinely does business in North Carolina, including in Mecklenburg County.

## III.   JURISDICTION AND VENUE

12.    The Court has jurisdiction over this action under 28 U.S.C. § 1332(a), the general diversity statute, because the amount in controversy exceeds $75,000, and there is complete diversity of citizenship among the parties.

13.    Venue lies in this district under 28 U.S.C. § 1391 because SensorRx resides in this district and because a substantial part of SensorRx's property that is the subject of this action is situated in this district.

## IV.   FACTS

### A. SensorRx's Mission

14.    SensorRx was formed in May 2015 for the purpose of developing solutions for migraine sufferers. Migraines are the third most prevalent illness in the world, affecting more than one billion people worldwide.

15.    By December 2015, SensorRx had begun to focus its efforts on the problem of patients underreporting and misreporting their migraine data, an issue

4

that affects the ability of health care providers to effectively treat their migraine patients.

16.     To address the reporting problem, SensorRx developed a migraine management system called MigrnX that included an application for Apple and Android operating systems that would allow patients to use their cell phones to track information related to migraine symptoms and possible migraine triggers. Patients have the ability to automatically transmit that information to their electronic health record so that their physicians will have prompt access to information critical in making treatment decisions.

**B. MigrnX's Development**

17.     MigrnX underwent its first testing in 2016 as part of a study with a major hospital and healthcare system.

18.     MigrnX was released on the Apple App Store and Google Play Store at the beginning of March 2017.

19.     MigrnX was, and still is, only accessible with unique access codes.

20.     To gain access to MigrnX after downloading it, a patient needs to have a physician recommend MigrnX and provide the patient with an access code unique to that healthcare provider. One of the benefits of this process is that the data being gathered by the MigrnX platform can be accurately and promptly transmitted to the healthcare provider if the user desires.

21.     This unique process led to MigrnX being the first and only fully clinically integrated migraine product on the market.

22. MigrnX, which was based on years of research, has been the subject of multiple peer reviewed abstracts, has been used in multiple studies, and has had at least one patent issued, with several more patents pending.

23. MigrnX is one of the only platforms monitoring headaches that can be used with both Android and Apple cell phones. This ability is important since many migraine sufferers use less expensive Android devices.

24. The MigrnX digital platform also provides an interface and experience for the users, based on research, that substantially increases the reliability of patients' reporting and the likelihood that patients will continue to use MigrnX.

25. In addition to data input by the migraine sufferers, the MigrnX digital platform automatically gathers environmental data regarding conditions known to trigger migraines – data needed by physicians for effective treatment.

26. MigrnX's tracking and communication abilities create predictive opportunities for healthcare providers and patients to be alerted to conditions that may trigger migraines based on past data. This unique system has led to improved patient outcomes and has attracted interest from high profile investors and potential business partners.

27. Two aspects in particular of the MigrnX migraine management system differentiate it from other migraine programs on the market. First, MigrnX's simplicity of use – distilling the information needed for effective treatment into a minimum number of clicks during the migraine headache – ensures accurate reporting and continued usage. No other application understood and mastered that

simplicity. Second, MigrnX's integration with the patient's electronic medical record and treatment process further advanced effective treatment by (1) involving both the physician and patient, and (2) having data transmitted directly from the patient's cell phone to the electronic medical record and health care provider to ensure prompt and accurate data for use in treatment decisions.

28. Further, the MigrnX platform contains unique predictive algorithms that utilize previous migraine tracking data to predict when a user may be more likely to suffer a migraine so that the user may alter their environmental conditions and avoid the migraine altogether.

29. The MigrnX migraine management system has the best outcomes data of all competing migraine programs, and long term users of the platform have exhibited substantially reduced headache frequency and intensity.

30. MigrnX is the first migraine management system that connects directly to patients' electronic health records.

31. MigrnX also was chosen to be the migraine management system for an FDA-funded registry for pediatric migraine patients.

32. The unique platform and capabilities created by SensorRx for MigrnX were further developed to provide a platform that could also be used to develop management systems to aid with treatment and prevention for other chronic health issues such as COPD and Irritable Bowel Syndrome among others.

## C. Eli Lilly's Initial Proposal Regarding MigrnX

33. In September 2018, Eli Lilly Vice President of Transactions Katie Hewitt met Dr. George McLendon, the Chairman and a co-founder of SensorRx, while attending a conference in Seattle, Washington. Ms. Hewitt and Dr. McLendon discussed MigrnX's success, and Ms. Hewitt expressed interest in having Eli Lilly explore potential business opportunities with SensorRx.

34. Shortly after that first meeting, several Eli Lilly employees, including Ms. Hewitt, participated in a conference call on September 21, 2018 with several SensorRx employees to discuss basic information about MigrnX and its success.

35. Following that conference call, Eli Lilly expressed interest in continuing discussions regarding a potential business relationship. As a result, Eli Lilly and SensorRx personnel had several further conference calls over the next couple of months.

36. On November 7, 2018, SensorRx notified Eli Lilly that it was interested in continuing discussions with Eli Lilly regarding business partnership opportunities and offered to meet in person.

37. Later that same day, a PwC employee downloaded MigrnX, registered for the account using a PwC email address, and attempted to access the application using an invalid access code. The IP address for the PwC employee showed that the employee was in Indianapolis, Indiana, where Eli Lilly is headquartered.

38. A week later, Eli Lilly Global Marketing Director Hannah Arbuckle, created an account on MigrnX using an IP address registered to Eli Lilly corporate.

She also attempted to access MigrnX with an invalid access code and was denied access.

39. Hours after Ms. Arbuckle's failed attempt to access MigrnX, Eli Lilly emailed SensorRx and notified them that Eli Lilly was "waiting for some additional clarity in [their] business planning process," which they hoped to have shortly after Thanksgiving.

40. After several more email and telephone exchanges, key executives of SensorRx and Eli Lilly met in person at a conference in San Francisco, California on January 8, 2019.

41. At that meeting, Eli Lilly's Senior Director of Digital Health, Kirk Keaffaber, informed SensorRx that Eli Lilly was looking for "a proven concept that has experience in the market, clinical validation, and is interoperable with the workflow." He agreed that MigrnX met those criteria, and pointed out that SensorRx had a need "to scale" – or, in lay terms, expand – its distribution of MigrnX.

42. Similarly, Ms. Hewitt indicated that she liked SensorRx because of its expertise in machine learning, user experience, and full integration capabilities, as well as the extensive clinical data it had already obtained with respect to MigrnX.

43. At the January 8 meeting, SensorRx permitted Eli Lilly to have limited access to MigrnX using a demonstration code (the "Demo Code"). That particular code only permitted access to part of MigrnX.

44.     Mr. Keaffaber logged into MigrnX at the meeting using the Demo Code and also logged into it again several weeks later without express authorization from SensorRx.

45.     Later on the evening of January 8, when Ms. Hewitt was introducing a SensorRx cofounder to another person, she announced: "I want to buy his company." She later said to the SensorRx cofounder in front of a person from another company: "You own a lot of shares, right?  I will make you a lot of money." She explained: "I push three deals at most a year.  Deals where it's a shame on us for not doing this. You are one of those deals."  Following this January 8 meeting, Eli Lilly requested that the SensorRx team meet in Indianapolis on January 31, 2019 to further explore partnership opportunities and provide a demonstration of MigrnX.

46.     On the day before the meeting, Eli Lilly provided SensorRx with a mutual confidentiality agreement and asked that SensorRx sign it prior to the meeting, which SensorRx and Eli Lilly both did.

47.     After SensorRx had signed the mutual confidentiality agreement and after Mr. Keaffaber had already had a chance to see the "demo" version of MigrnX, Eli Lilly informed the SensorRx executives for the first time that Mr. Keaffaber was working on a competing application. Eli Lilly acknowledged that the application was not very far along, but described the competing application as "more than a back of the napkin" concept. By contrast, MigrnX had three years of outcome data demonstrating its effectiveness and success in the market.

10

48. Eli Lilly executives, however, did not even seem aware that they would need to have data showing the effectiveness of their application before they could successfully market Eli Lilly's application. Dr. McLendon explained to the Eli Lilly executives that they could spend millions of dollars to figure out how to integrate their application with electronic health records and pay doctors to help them design workflow integration – research that SensorRx had already done – but Eli Lilly would still have to generate their own outcomes data for their competing application.

49. At the January 31, 2019 meeting, Mr. Keaffaber questioned why people would use MigrnX given its simplicity, which demonstrated to SensorRx that Eli Lilly lacked a fundamental understanding of what was needed for a successful migraine management system.

50. Despite the fact that Eli Lilly was developing a competing product, SensorRx was willing to continue with negotiations, since through the mutual confidentiality agreement and conversations with Ms. Hewitt and Charles Haddad, Senior Advisor of Digital Health for Eli Lilly, Eli Lilly expressly agreed that only members of the due diligence team would have access to MigrnX and the due diligence team would only use confidential information and access to MigrnX for the purpose of deciding whether Eli Lilly should enter into a business relationship with SensorRx.

51. SensorRx received an email from the head of the due diligence process confirming the specific people who would be part of the due diligence team, and

SensorRx relied upon Eli Lilly's promises that no one other than the people on that list would have access to information SensorRx supplied to Eli Lilly during the negotiation and due diligence process. Ms. Hewitt specifically promised that Mr. Keaffaber would not be part of the due diligence team.

52. Ms. Hewitt also expressly represented to SensorRx that Eli Lilly would not use its access to MigrnX in furtherance of its own development of a competing application.

53. The discussions between Eli Lilly and SensorRx continued following the January 31 meeting and ultimately led to the parties agreeing on March 13 to the terms that would make up a term sheet. The term sheet would, subject to Eli Lilly conducting a due diligence period, govern the business relationship between Eli Lilly and SensorRx, including not only use and marketing of MigrnX but also use of the MigrnX platform to co-develop solutions for other health conditions. Ms. Hewitt advised Dr. McLendon that she believed Eli Lilly would sign the term sheet by March 25 and then due diligence would take only four days.

54. During the discussions relating to the term sheet, Eli Lilly representatives, including Ms. Hewitt and Mr. Haddad, continued to assure SensorRx that no one working on Eli Lilly's competing application, called Vega Migraine, would have access to MigrnX and any of SensorRx's confidential information disclosed during due diligence.

55.     Several days later, on March 18, Ms. Hewitt and two other Eli Lilly employees traveled to Charlotte to discuss a joint development plan for MigrnX that would be included with the term sheet.

56.     During the March 18 meeting, SensorRx also explained that the ongoing negotiations with Eli Lilly were precluding SensorRx from raising additional capital through other sources and were complicating communications with other potential health system partners interested in providing MigrnX to their migraine patients. SensorRx told Eli Lilly that for those reasons it needed Eli Lilly to make a decision regarding the potential business relationship between the parties.

57.     During that visit, Eli Lilly also shared a demo of and screenshots from Vega Migraine, Eli Lilly's competing application. Vega Migraine at that time differed significantly from MigrnX in its visual display, the manner in which patients interacted with it, and its ability to interface with healthcare providers. Vega Migraine's interface was non-intuitive; it required the user to answer a barrage of questions; and it made the user revisit the app after symptoms had subsided to record the majority of the data the app sought to track.

58.     On March 21, 2019, Ms. Hewitt sent Dr. McLendon a term sheet for approval by the SensorRx Board of Directors. She promised that due diligence would proceed swiftly and a contract would be drafted simultaneously. The SensorRx Board of Directors subsequently voted to pursue the business partnership with Eli Lilly.

13

59.    The term sheet provided not only for investment by Eli Lilly in SensorRx and MigrnX, but also for the two companies to develop additional products for other diseases – as SensorRx had intended to do.  The term sheet was designed to allow Eli Lilly to have the benefit of SensorRx's technical expertise as well as access to its proven and successful MigrnX, including proprietary marketing strategies, while SensorRx would have the benefit of Eli Lilly's financial resources and extensive marketing power.

### D. Eli Lilly's Decision, Once it Acquired Extensive Confidential Information from SensorRx, to Terminate Negotiations with SensorRx and Pursue its Own Copycat Application.

60.    Once Eli Lilly and SensorRx entered into the due diligence period, Eli Lilly proceeded more at a snail's pace than swiftly. SensorRx was required to respond repeatedly to more and more questions purportedly for purposes of due diligence about SensorRx's trade secrets and other confidential information. Each time, SensorRx left conversations with the understanding that Eli Lilly had all of the information it needed to evaluate whether a partnership with SensorRx made sense, only subsequently to be asked for even more information.

61.    As the due diligence period lengthened, Eli Lilly asked fewer and fewer questions about MigrnX and instead began insisting that SensorRx share the knowledge SensorRx had acquired through development and implementation of the MigrnX migraine management system about mobile application usage patterns, marketing digital health programs to health systems, and methods of interfacing with electronic medical records and health care providers.  Eli Lilly also wanted to

14

know why SensorRx had made certain engineering decisions with respect to the MigrnX platform.

62.    In attempts to satisfy Eli Lilly's requests, and with the understanding that this information was not being shared outside of the due diligence team, SensorRx provided a wealth of confidential information and trade secrets that had made MigrnX successful.

63.    In late April 2019, Dr. McLendon notified Ms. Hewitt that if a partnership was going to happen with Eli Lilly, the agreement needed to be reached by the end of May. Dr. McLendon again explained that the urgency was because the negotiations with Eli Lilly were precluding SensorRx from raising additional capital, as well as complicating talks with other partner hospital systems.

64.    Ms. Hewitt indicated that she thought Dr. McLendon's deadline was realistic.

65.    On May 9, Eli Lilly and SensorRx executives had another in person meeting.

66.    At that meeting, Eli Lilly's Chief Digital Officer, Divakar Ramakrishnan, spent time selling SensorRx on why Eli Lilly was the right partner for SensorRx.

67.    After the meeting, Dr. McLendon met with Ms. Hewitt to continue discussing the terms of a partnership.

68.    On May 13, SensorRx sent an email to Ms. Hewitt indicating that SensorRx needed a decision soon from Eli Lilly, so that SensorRx could explore

options with other potential investors and partners if Eli Lilly declined to pursue a business relationship with SensorRx.

69. Ms. Hewitt responded the next day by text message that she had asked Mr. Ramakrishnan to decide if he was willing to move ahead and make an equity investment in SensorRx. She stated that she would have an answer by Friday of that week.

70. On Friday, May 17, SensorRx was told that Mr. Ramakrishnan would approve a $1,000,000 equity investment in SensorRx, pending due diligence calls with two executives of a major hospital system partnering with SensorRx in using MigrnX and an in person visit by SensorRx's Chief Technology Officer to discuss a "quality management system." SensorRx learned that the calls with the hospital executives about their hospital system's experience with SensorRx and MigrnX had gone well. SensorRx understood that Eli Lilly would be going forward with the business deal with SensorRx.

71. Either that day or the next, Ms. Hewitt also informed SensorRx that Eli Lilly had fired the IT consultants that had been assisting them with the development of Vega Migraine. SensorRx understood that the reason for the firing of the consultants was because Eli Lilly intended to shut down the Vega Migraine development project.

72. Around the same time, after SensorRx had been told Eli Lilly had committed to the investment in SensorRx and Vega Migraine would be shut down, Mr. Keaffaber began pressuring SensorRx to let Eli Lilly see the software code that

16

allowed MigrnX to effectively predict whether a patient using MigrnX would suffer a migraine given existing conditions. SensorRx refused to provide that code since there was no reason that Eli Lilly needed the code in order to enter into a business relationship with SensorRx, but it did provide other relevant confidential information.

73. The next week, on May 22, SensorRx's Chief Technology Officer met with members of Eli Lilly's due diligence team as well as its digital health team.

74. In advance of the meeting, Ms. Hewitt provided revised terms of a partnership to SensorRx that she represented were non-binding, but indicated that all that remained was for certain additional information to be confirmed by SensorRx at the May 22 meeting.

75. At the May 22 meeting, Eli Lilly presented a demo of the Vega Migraine app. The demonstration was performed by an Eli Lilly employee named Mark Collins who had been working on Vega Migraine. SensorRx was told that Mr. Collins had only learned of Eli Lilly's discussions with SensorRx during the previous week.

76. It was unclear to SensorRx why Mr. Collins was ever aware of the discussions with SensorRx given that the mutual confidentiality agreement barred such disclosure. In hindsight, the statement was clearly false as well, because SensorRx has since learned that Mr. Collins in fact accessed Migraine Coach on May 8. Migraine Coach was another application owned by SensorRx, and there was no legitimate reason for a member of the Eli Lilly Vega Migraine development team

to be accessing Migraine Coach. Nor could Mr. Collins lawfully use Migraine Coach to help design Vega Migraine under the licensing agreement for anyone opening a Migraine Coach account.

77. Upon seeing the progress that Vega Migraine had made in the two months since Eli Lilly had first shown SensorRx a demo of the competing application, SensorRx's Chief Technology Officer was stunned at how similar Vega Migraine had become to MigrnX. Some of Vega Migraine's screens were strikingly similar to those of MigrnX with the user interface and user experience mimicking that of MigrnX. Even the Vega Migraine PDF export report to be provided to doctors, which was not publicly available, was notably similar to that of MigrnX.

78. The May 22 version of Vega Migraine bore little resemblance to the March version of Vega Migraine. In two months, Vega Migraine had transformed from a convoluted application unlikely to be successful into a MigrnX look-alike.

79. Based on SensorRx's discussions with Eli Lilly over the prior several months and Eli Lilly's initial efforts in developing the application, it was apparent that Eli Lilly lacked the technical knowledge and digital experience to make the dramatic changes in Vega Migraine without using the information that it had obtained from SensorRx through the due diligence process and, as explained below, through other illicit means.

80. At that same May 22 meeting, Charles Haddad, Senior Advisor of Digital Health for Eli Lilly, told all of the participants at the meeting that another meeting would take place the following Tuesday to discuss a plan for winding down

Vega Migraine. He requested that attendees come prepared with plans to wind it down.

81.     Eli Lilly pressed SensorRx during the May 22 meeting to provide specific details relating to MigrnRx's front and back end architecture – in other words, technical software details about the MigrnX application and the MigrnX server and integration process. Eli Lilly also questioned SensorRx regarding SensorRx's electronic medical record integration process and how MigrnX fits into physician workflow. MigrnX's integration with electronic medical records and physician workflow is one of the key factors that sets it apart from all other available products, and that integration has also led to improved patient outcomes as it keeps both doctors and patients involved with the program.

82.     SensorRx provided the requested information about the architecture and the integration process in reliance on Eli Lilly's assurances that Vega Migraine was being shut down and that SensorRx would be partnering with Eli Lilly.

83.     SensorRx would not have disclosed the requested confidential information and trade secrets had it known that Eli Lilly was in fact planning to terminate its relationship with SensorRx and use the information it had learned from SensorRx to improve Vega Migraine and expedite its entry in the market.

84.     However, just a few days later, on May 28, Ms. Hewitt informed Dr. McLendon that Eli Lilly was terminating due diligence, and would not be pursuing a partnership with SensorRx as it had instead decided to continue developing Vega Migraine.

19

85.     Remarkably, SensorRx later learned that only hours before Ms. Hewitt notified Dr. McLendon of the termination of due diligence and negotiations, SensorRx's lead clinical consultant received a request from Eli Lilly -- purportedly as part of Eli Lilly's due diligence on SensorRx -- requesting proprietary information on a clinical algorithm that was being developed for MigrnX.

86.     On November 5, 2019, Eli Lilly launched Vega Migraine in the Apple App Store.

87.     From the demonstration made to SensorRx in May 2019 and review of screenshots in the Apple App store, it is obvious that many key functionalities of Vega Migraine were copied from MigrnX.

88.     Indeed, the description in the Apple App Store states: "The Vega Migraine app is used as a part of a limited release to log migraine information and share that information with your doctor. At this time, Vega requires a registration code, provided by a healthcare provider, to access app functionality. For those involved in this limited release, registration codes can be found in the onboarding materials provided by your healthcare provider." This entire approach was derived solely from MigrnX.

89.     Further, Eli Lilly would not have even learned of the functionalities but for the confidential information it pressed SensorRx to share under the guise that Eli Lilly: (1) was actually interested in a partnership with SensorRx; and (2) was not sharing the confidential information with the team at Eli Lilly that was developing Vega Migraine.

20

90.     MigrnX's key functionalities had resulted in demonstrable success in the critical areas of patients' continued use of the application and reduction of headaches. Vega Migraine, in the absence of its transformation to mimic MigrnX, would not likely have been able to meet those requirements for success. Vega Migraine's design, including its user interface and user experience, would likely have led migraine sufferers to abandon the application and would have resulted in only limited, if any, reduction of headaches.

91.     It is apparent that Eli Lilly used its negotiation posture to steal as much confidential information from SensorRx as possible, so that it could share that information with the team developing Vega Migraine and dramatically decrease the development time for Vega Migraine and equally dramatically increase Vega Migraine's potential for success.

92.     Eli Lilly knew that they were not just copying a software application, but rather were stealing a migraine management system that had been designed based on years of research. Moreover, Eli Lilly knew that the system they were stealing was effective based on outcomes data obtained by SensorRx.

**E. SensorRx has Since Discovered that Eli Lilly Employees Were Accessing MigrnX Without Authorization in Order to Assist Eli Lilly's Development of Vega Migraine**

93.     During the due diligence period, SensorRx produced to Eli Lilly at its request some of the onboarding materials that it had provided to a major hospital and healthcare system for its healthcare providers to give migraine patients wanting to use MigrnX.

94.     Included in those materials was the unique code that the hospital system's providers would use for their patients to access MigrnX (the "Hospital Code"). At the time of due diligence, the Hospital Code had been replaced by a different code because of the health system's name change. The Hospital Code remained active, however, for patients who had originally opened an account using that code.

95.     Because Eli Lilly agreed, both in writing and in numerous verbal communications, that the due diligence materials would not be shared outside of the due diligence team, SensorRx was not concerned about the Hospital Code being used inappropriately. Instead, SensorRx offered to provide the due diligence team with its own unique demonstration code, although that code would not have provided the due diligence team with access to all aspects of MigrnX.

96.     No one from the due diligence team requested a demo code until March 27, 2019. That demo code did not provide full access to MigrnX's functionality. Non-due diligence team members had, however, by then, already fraudulently obtained full MigrnX access through use of the Hospital Code misappropriated from the due diligence materials.

97.     SensorRx has discovered that beginning in early March 2019, many Eli Lilly employees outside of the due diligence team and at least one PwC employee working as a consultant to Eli Lilly were masquerading as migraine sufferers and creating MigrnX accounts using the Hospital Code in order to obtain full access to MigrnX. Upon information and belief, these Eli Lilly employees and the PwC

consultant were working on the development of Eli Lilly's competing Vega Migraine application.

98.     Even after Eli Lilly announced to SensorRx that it was terminating due diligence and negotiations because Eli Lilly had decided to pursue its own Vega Migraine app, Eli Lilly employees continued to try to fraudulently access and use MigrnX and the related application Migraine Coach.

99.     Moreover, even members of the due diligence team were accessing MigrnX and Migraine Coach after terminating due diligence and negotiations.

100.    At times, more than one employee would access MigrnX at approximately the same time suggesting that they may have been reviewing the application and working with it at the same time.

101.    In addition, Tyler Mansfield, an employee with PwC who was consulting with Eli Lilly, also posed as a migraine patient to open an account using the Hospital Code.  Ms. Mansfield created her account using a Gmail email address in her maiden name of Akeson.  She then used that account to gain full access to MigrnX as she worked with the Eli Lilly employees who were responsible for the Vega Migraine app.

102.    Because Eli Lilly employees accessed MigrnX over and over again, even after negotiations with SensorRx had ended, it is obvious that Eli Lilly's employees – especially the team developing the Vega Migraine app – had concluded that they valued what they could learn surreptitiously from the MigrnX application and that they needed MigrnX in order to bring Vega Migraine to market.

23

103.     Specifically and by way of example, at least the following individuals who were not part of the due diligence team accessed MigrnX without authorization at the following dates, times and locations:

a. Mr. Keaffaber (the primary individual responsible for the Vega Migraine project) first accessed MigrnX without authorization in January 2019 using the Demo Code he had been given for use at the January 8, 2019 meeting. At that time, Eli Lilly was still hiding from SensorRx the fact that Mr. Keaffaber was heading up a team developing an app that would compete with MigrnX. Mr. Keaffaber subsequently opened up an account using the Hospital Code and pretended to be a migraine sufferer who was being treated by that hospital and healthcare system.

b. On March 11, 2019, Mr. Keaffaber unlawfully accessed MigrnX within one minute of Ms. Hewitt, while both were connected to the Eli Lilly and Company IP subnet.

c. Mr. Keaffaber then accessed MigrnX without authorization many more times until the final time that he accessed it on May 3, 2019 at 7:44 a.m. while in Indianapolis.

d. Hannah Arbuckle (the Director of Digital Brand Strategy and Implementation for Eli Lilly) first accessed MigrnX without authorization on March 8, 2019 at 9:25 a.m. while connected to the Verizon Wireless network in Indianapolis, Indiana.

e. Ms. Arbuckle then accessed MigrnX without authorization several additional times, including as recently as October 2, 2019 at 5:12 p.m. while connected to the AT&T U-Verse network in Indianapolis, Indiana. On March 14, 2019, Ms. Arbuckle exported the PDF report that Eli Lilly subsequently virtually copied for use with Vega Migraine.

f. Ms. Arbuckle, on more than one occasion unlawfully accessed MigrnX from the same location within minutes of another Eli Lilly employee or a PwC consultant.

g. For example, on March 19, 2019 Ms. Arbuckle accessed MigrnX within 18 minutes of Ms. Zoe Kern (a marketing associate with Eli Lilly) while Ms. Arbuckle was connected to the Eli Lilly Company corporate internet.

h. Also, on April 3, 2019, Ms. Arbuckle accessed MigrnX within 5 minutes of Ms. Mansfield (the PwC consultant helping Eli Lilly develop Vega Migraine) while Ms. Arbuckle was connected to the Eli Lilly and Company corporate internet.

i. Ms. Mansfield also unlawfully accessed MigrnX on May 30, 2019 at 2:49 p.m, two days after Eli Lilly had terminated the due diligence period.

j. Zoe Kern accessed MigrnX on May 28, the day due diligence and negotiations ended, and also June 6.

k. Ms. Arbuckle also again unlawfully attempted to access MigrnX on August 16, 2019 within 9 minutes of when Chris Collins (a newly hired advisor on UX Design at Eli Lilly's Design Labs in the Digital Health

Division) accessed Migraine Coach while they were both connected to the Eli Lilly and Company corporate internet.

l. Ms. Arbuckle made an additional attempt to access MigrnX on October 2, 2019, as did another Eli Lilly employee on October 3, 2019.

## F. Eli Lilly's Release of a Carbon Copy Competing Product Has Caused Irreparable Injury to SensorRx

104. On November 5, 2019, Eli Lilly released Vega Migraine into the Apple App Store.

105. The version of Vega Migraine that was released contains many identical features to MigrnX and adopts a marketing and distribution strategy unique to SensorRx that Eli Lilly had learned from SensorRx.

106. Those features were not present in the early versions of Vega Migraine that were shown to SensorRx, and in fact, were inconsistent with the types of features Eli Lilly had initially indicated it believed were necessary to create a successful application.

107. Indeed, the features that Eli Lilly copied from SensorRx are the very ones that make SensorRx so effective.

108. Moreover, prior to acquiring SensorRx's confidential information and trade secrets through the due diligence process and the illicit activities of the Vega Migraine development team, Eli Lilly was not aware of the unique integration strategies that play a major role in the success of MigrnX. Eli Lilly has, however, illegally copied those strategies from MigrnX to ensure its own success.

26

109. Given Eli Lilly's size and its marketing and sales abilities as compared to SensorRx's much more limited capabilities, Eli Lilly's theft of the primary features and strategies of the MigrnX migraine management system will effectively force SensorRx from the marketplace. SensorRx does not have the resources to compete with a carbon copy of MigrnX that is backed by a company with the resources and competitive advantages of Eli Lilly.

## V. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Unfair and Deceptive Practices**
**in Violation of N.C. Gen. Stat. § 75-1.1 *et seq*.**

110. Plaintiff incorporates herein by reference each of the preceding facts and allegations as if fully set forth herein.

111. Defendant's conduct, as described above, is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to SensorRx and, therefore, unfair under N.C. Gen. Stat. § 75-1.1 *et seq*.

112. Eli Lilly's violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-154(a), constitutes an unfair method of competition and an unfair or deceptive trade practice in violation of N.C. Gen. Stat. § 75-1.1 *et seq*.

113. Eli Lilly's extensive pattern of fraudulent acts and omissions directed at SensorRx also constitutes an unfair method of competition and an unfair or deceptive trade practice in violation of N.C. Gen. Stat. § 75-1.1 *et seq*.

114. Defendant's conduct described herein has injured, and will continue to injure the goodwill and business of the plaintiff.

27

115.  Defendant's conduct described herein has resulted in damages to SensorRx in excess of $75,000 and, unless enjoined, will continue to result in damages and losses to the plaintiff.

116.  Accordingly, pursuant to N.C. Gen. Stat. § 75-1.1 and § 75-16, Plaintiff is entitled to recover from Defendant such damages as it may prove at trial and to have those damages trebled. Plaintiff is also entitled to recover its reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

**SECOND CLAIM FOR RELIEF**
**Fraud/Fraudulent Concealment**

117.  Plaintiff incorporates herein by reference each of the preceding facts and allegations as if fully set forth herein.

118.  As detailed herein, Eli Lilly made numerous false misrepresentations to SensorRx and concealed multiple material facts from SensorRx.

119.  Specifically, Eli Lilly's employees fraudulently posed as migraine sufferers, and as patients of a major hospital and healthcare system, in order to create MigrnX accounts and to unlawfully access MigrnX.

120.  Eli Lilly's employees did so for the sole purpose of obtaining confidential data they could use to further development of Vega Migraine.

121.  Eli Lilly never told SensorRx that its employees were accessing MigrnX without authorization.

122.  Eli Lilly's employees also sought confidential information and trade secrets from SensorRx under the guise of due diligence when it had no intention of ultimately closing a deal with SensorRx. Instead, it wanted this information for the

28

sole purposes of improving its own application, expediting entry into the market, and gaining a competitive advantage for its application in the marketplace.

123. Eli Lilly's employees further represented that they would not share the confidential information they learned from SensorRx with members of the team developing and delivering Vega Migraine.

124. These representations by Eli Lilly were false.

125. Eli Lilly employees also falsely represented to SensorRx that they were not going to proceed with Vega Migraine and were winding down development of that application.

126. All of the above representations were false when made and Eli Lilly and its agents knew that they were false when made. Eli Lilly intended to deceive SensorRx when it made these representations.

127. SensorRx reasonably and justifiably relied on Eli Lilly's representations.

128. SensorRx was damaged by Eli Lilly's fraudulent statements and actions in an amount exceeding $75,000.

129. Furthermore, Eli Lilly fraudulently concealed from SensorRx that it was using information it learned from SensorRx to develop and market Vega Migraine. Eli Lilly had a duty to speak because it chose to speak by engaging in discussions with SensorRx regarding a possible partnership, and disclosing that Eli Lilly was working on a competing application, thereby taking on a duty to make a

full and fair disclosure of facts concerning the matter on which Eli Lilly chose to speak. It also took affirmative steps to conceal material facts from SensorRx.

130.   As a result of Eli Lilly's fraudulent conduct, SensorRx is entitled to recover compensatory and punitive damages in an amount exceeding $75,000.

## THIRD CLAIM FOR RELIEF
### Fraudulent Inducement

131.   Plaintiff incorporates herein by reference each of the preceding facts and allegations as if fully set forth herein.

132.    Eli Lilly first began development of Vega Migraine at the end of 2018.

133.   At the time that it was beginning to develop Vega Migraine, Eli Lilly also began to engage SensorRx in discussions about a possible partnership.

134.   In January 2019, Eli Lilly and SensorRx agreed to a confidentiality agreement in order to continue their discussions about a possible partnership so that confidential information shared between the parties would be protected.

135.   After SensorRx agreed to the confidentiality agreement, Eli Lilly disclosed for the first time that they had a competing product they were developing.

136.   As SensorRx has alleged throughout this document, Eli Lilly then used trade secrets and other confidential information it learned through the due diligence period and through unlawful access to MigrnX after the due diligence period to assist in development and marketing of their own application.

137.   SensorRx believes in hindsight that Eli Lilly's motivation to enter the due diligence period was to obtain trade secrets and other confidential information

from SensorRx for Eli Lilly to use for its own purposes. compensating SensorRx in any way.

138.    Had SensorRx known of Eli Lilly's motivation, SensorRx would not have agreed to the due diligence process and shared its confidential information and trade secrets with Eli Lilly.

139.    As a result of Eli Lilly's fraudulent inducement to enter into negotiations and the due diligence period and share its confidential information and trade secrets, SensorRx is entitled to recover compensatory and punitive damages from Eli Lilly in an amount exceeding $75,000.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment

140.    Plaintiff incorporates herein by reference each of the preceding facts and allegations as if fully set forth herein.

141.    At the specific request of Eli Lilly and for its use and benefit as part of the due diligence process, SensorRx provided confidential information and trade secrets to Eli Lilly that Eli Lilly then used to develop Vega Migraine.

142.    The value of the information provided to Eli Lilly by SensorRx for which it has not been paid is in excess of $75,000, although the exact amount is for the jury.

143.    During and since SensorRx provided the information to Eli Lilly, Eli Lilly has failed to pay SensorRx.

144.    Further, Eli Lilly has unlawfully utilized this information in order to generate its own revenue through Vega Migraine.

31

145.   As a result of Eli Lilly's refusal to pay SensorRx for SensorRx's information and efforts, Eli Lilly has become unjustly enriched in the amount of at least $75,000.

**FIFTH CLAIM FOR RELIEF**
**Misappropriation of Trade Secrets**
**in Violation of N.C. Gen. Stat. §§ 66-152, *et seq*.**

146.   Plaintiff incorporates herein by reference each of the preceding facts and allegations as if fully set forth herein.

147.   The information unlawfully used by Eli Lilly consists of business and/or technical information that constitutes a trade secret as defined by N.C. Gen. Stat. § 66-152(3) because it includes, among other things, unique aspects of MigrnX's user interface and method of logging data, MigrnX's back end architecture, MigrnX's predictive algorithms, MigrnX's interfacing with electronic medical records, and SensorRx's strategies for marketing MigrnX. The expensive and time-consuming development of this migraine management system created a platform that SensorRx could easily use to apply the MigrnX proprietary system to other health problems.

148.   This information derives independent actual or potential commercial value from not being known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use.

149.   The manner in which Defendant accessed MigrnX without authorization, disclosed the trade secrets contained within MigrnX to the employees

developing Vega Migraine without consent by SensorRx, and used the trade secrets contained within MigrnX constitutes misappropriation within the meaning of N.C. Gen. Stat. § 66-152(1).

150. Eli Lilly is a "person" within the meaning of N.C. Gen. Stat. § 66-152(2).

151. SensorRx has at all times taken reasonable and appropriate steps to maintain the secrecy and confidentiality of the trade secrets and confidential information contained in MigrnX.

152. Specifically, SensorRx required a healthcare provider to provide a code to his or her migraine patients that enabled access to MigrnX. Without this code, MigrnX is inaccessible. Additionally, users of MigrnX and Migraine Coach were prohibited from copying information, or using information gleaned by access to MigrnX and Migraine Coach to create derivative works or products.

153. Eli Lilly was provided with a healthcare provider's code during the due diligence period. Eli Lilly gave SensorRx express assurances that no individuals outside of the due diligence team would be given the access code. Eli Lilly specifically told SensorRx that the due diligence team did not include any employees working on the development of Eli Lilly's competing application.

154. SensorRx provided other confidential information and trade secrets to Eli Lilly pursuant to a mutual confidentiality agreement and in reliance upon Eli Lilly's assurances that the information and trade secrets would not be provided to anyone outside the due diligence team.

155. On the same date that the due diligence period was terminated, SensorRx's CEO Dr. McLendon emailed Eli Lilly and requested that its employees no longer access MigrnX.

156. Eli Lilly had already broken its previous promises not to disclose the provider code to its Vega Migraine development team. Indeed, SensorRx has since learned that Kirk Keaffaber (the Eli Lilly employee primarily responsible for the Vega Migraine project) had accessed it numerous times prior to this date.

157. SensorRx has also recently learned that numerous other Eli Lilly employees and at least one PwC consultant accessed MigrnX without authorization using the provider code and/or the demo code provided to Eli Lilly during due diligence.

158. SensorRx's trade secrets derive independent commercial value in not being generally known or readily ascertainable by SensorRx's competitors, including, but not limited to, Eli Lilly.

159. Eli Lilly has fraudulently converted, misappropriated, misused, disclosed, and/or intended to disclose SensorRx's trade secrets in order to gain, or permit others to gain, an unfair competitive advantage over SensorRx.

160. Specifically, Eli Lilly has used SensorRx's trade secrets to, among other things, create Vega Migraine.

161. SensorRx believes that Eli Lilly will continue to misappropriate, misuse, and disclose SensorRx's trade secrets unless it is enjoined from doing so.

162. Eli Lilly's misappropriation, misuse, and threatened or actual disclosure of SensorRx's trade secrets has irreparably injured, and threatens to irreparably injure, SensorRx. SensorRx has no adequate remedy at law.

163. Under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-154(a), SensorRx is entitled to an injunction prohibiting Eli Lilly from further disclosing, misappropriating, or misusing SensorRx's trade secrets, and requiring Eli Lilly to discontinue marketing and usage of Vega Migraine.

164. By their actions alleged herein, Eli Lilly has violated the North Carolina Trade Secrets Protection Act, N.C.G.S. § 66-154(a).

165. SensorRx is entitled under N.C. Gen. Stat. § 66-154(b) to recover all damages caused by the Defendant's misappropriation, misuse, and/or disclosure of Plaintiff's trade secrets.

166. Eli Lilly's actions were willful and malicious, and SensorRx is further entitled to punitive damages and reasonable attorneys' fees, pursuant to N.C. Gen. Stat. § 66-154(c) and (d).

## SIXTH CLAIM FOR RELIEF
### Violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836

167. Plaintiff incorporates herein by reference each of the preceding facts and allegations as if fully set forth herein.

168. The trade secrets that Eli Lilly misappropriated from SensorRx are related to a product used in, or intended for use in, interstate commerce.

169. SensorRx is an "owner" within the meaning of 18 U.S.C. § 1839 of the trade secrets misappropriate by Eli Lilly as described herein.

35

170. Eli Lilly is a "person" within the meaning of 18 U.S.C. § 1839.

171. The information Eli Lilly acquired and used from SensorRx in the development of Vega Migraine constitutes a trade secret within the meaning of 18 U.S.C. § 1839 as the information acquired and used consisted of at least: unique characteristics of MigrnX's user interface and back end architecture, SensorRx's unique digital health marketing strategy, MigrnX's unique capabilities to interface with electronic medical records and physician workflow, MigrnX's method of logging migraine symptoms, triggers, and environmental conditions, and MigrnX's predictive coding abilities.

172. This information derives independent economic value from not being generally known to, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

173. This information is also all reasonably maintained confidential as MigrnX is only accessible to migraine sufferers with a unique code from their healthcare provider and because the information was only shared with limited individuals at Eli Lilly under the terms of a confidentiality agreement.

174. As described herein, Eli Lilly acquired and used trade secrets from SensorRx relating to, among other things, MigrnX's user interface; its back end architecture; its predictive algorithms; its interfacing with electronic health records and physician workflow; its method of logging migraine symptoms, triggers, and environmental conditions; and SensorRx's strategies for marketing MigrnX.

36

175.   Eli Lilly knew, or had reason to know that these trade secrets were obtained through unlawful access to MigrnX and other fraudulent means such as through information disclosed to Eli Lilly employees outside of the due diligence team.

176.   Eli Lilly also disclosed these trade secrets to Eli Lilly's and PwC's employees who were working on the development of Vega Migraine without express or implied authorization from SensorRx.

177.   Eli Lilly did not have express or implied authorization to use SensorRx's trade secrets in the development of Vega Migraine.

178.   Eli Lilly knew or should have known that the information it was using in the development of Vega Migraine had been derived from or through individuals who had utilized improper means to acquire it. Further, they knew or should have known that the information they were using was subject to a confidentiality agreement and was not to be utilized for the development of Vega Migraine. Finally, Eli Lilly should have known that the information was obtained from or through individuals on the due diligence team that owed SensorRx a duty to maintain its secrecy.

179.   As a result of Eli Lilly's violation of the Federal Defend Trade Secrets Act, SensorRx has suffered damages in an amount in excess of $75,000, including costs, attorneys' fees, and exemplary damages as allowed by law.

37

180.    SensorRx has also been irreparably harmed by Eli Lilly's conduct such that Eli Lilly should be enjoined from continuing to use SensorRx's trade secrets, including being enjoined from further use and marketing of Vega Migraine.

## VI.    PRAYER FOR RELIEF

WHEREFORE, SensorRx respectfully prays:

1.    That SensorRx be granted preliminary and permanent injunctive relief against Eli Lilly prohibiting Eli Lilly from further using SensorRx's confidential information and trade secrets, including but not limited to injunctive relief requiring Eli Lilly to remove Vega Migraine from the Apple App Store;  prohibiting Eli Lilly from allowing any more patients to use Vega Migraine apart from those who already have accounts; and prohibiting Eli Lilly from marketing Vega Migraine to hospitals and healthcare providers.

2.    That SensorRx have and recover damages from Eli Lilly for violations of the North Carolina Unfair and Deceptive Acts and Practices Act in an amount exceeding $75,000, plus interest, costs, trebled damages, and attorneys' fees as allowed by law;

3.    That SensorRx have and recover damages from Eli Lilly for fraud and/or fraudulent concealment in an amount exceeding $75,000, plus interest, costs, punitive damages, and attorneys' fees as allowed by law;

4.    That SensorRx have and recover damages from Eli Lilly for its fraudulent inducement in an amount exceeding $75,000, plus interest, costs, punitive damages, and attorneys' fees as allowed by law;

5.     That SensorRx have and recover damages from Eli Lilly for its unjust enrichment in an amount exceeding $75,000, plus interest, costs, and attorneys' fees as allowed by law;

6.     That SensorRx have and recover damages from Eli Lilly for violations of the North Carolina Trade Secrets Protection Act in an amount exceeding $75,000, plus interest, costs, punitive damages, and attorneys' fees as allowed by law

7.     That SensorRx have and recover damages from Eli Lilly for their violations of the Federal Defend Trade Secrets Protection Act in an amount exceeding $75,000, plus interest, costs, punitive damages, and attorneys' fees as allowed by law;

8.     That SensorRx be awarded punitive damages;

9.     That all costs of this action be taxed against Eli Lilly;

10.    That Eli Lilly be enjoined from continuing the conduct complained of herein;

11.    That the Court award SensorRx such other and further relief as this Court may deem just and proper.

This, the 22nd day of November, 2019.

*/s/ Martha Geer*
Martha A. Geer
N.C. State Bar No. 13972
Jeremy R. Williams
N.C. State Bar No. 48162
**WHITFIELD BRYSON & MASON, LLP**
P.O. Box 12638
Raleigh, NC 27605
Telephone: 919-600-5000
Facsimile: 919-600-5035
Email: martha@wbmllp.com

39

Email: jeremy@wbmllp.com

John C. Whitfield*
Caroline R. Taylor*
**WHITFIELD BRYSON & MASON, LLP**
19 North Main Street
Madisonville, Kentucky 42431
Tel: (270) 821-0656
Fax: (270) 825-1163
john@wbmllp.com
caroline@wbmllp.com

Clifford C. Marshall, Jr., Esq.
NC State Bar No. 10418
**MARSHALL ROTH & GREGORY, P.C.**
P.O. Box 769
Asheville, NC 28802
Telephone: (828) 281-2100
Facsimile: (828) 281-2120
Email: cmarshall@mrglawfirm.com

***Attorneys for Plaintiff***

* to be admitted *pro hac vice*